Exhibit
3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : CIVIL TERM   PART 4
--------------------------------------------X
M.H.,

                              Plaintiff,

           – against –                    (VIA MS TEAMS)
                                          INQUEST
E.T. A/K/A E.M.,

                           Defendant.
--------------------------------------------X
INDEX NO. 161144/20        Microsoft Teams Session
                           September 13, 2022


BEFORE:

        THE HON. FRANK P. NERVO, J.S.C.


APPEARANCES:


DANIEL SZALKIEWICZ & ASSOCIATES, P.C.
Attorneys for Plaintiff
23 West 73rd Street – Suite 102
New York, New York  10023
BY: DANIEL SZALKIEWICZ, ESQ.




ALSO PRESENT: M.H., Plaintiff


                    *         *         *




                         JACK L. MORELLI
                         Senior Court Reporter

PROCEEDINGS

1    THE COURT:  Good morning.  This is the judge

2    speaking.  Can you hear me, Mr. Szalkiewicz?

3    MR. SZALKIEWICZ:  Yes, Your Honor.  Good

4    morning.  You obviously can hear me.

5    THE COURT:  I can.  Thank you.  Your client is

6    here, MH?

7    MR. SZALKIEWICZ:  That is Marisa.  She should be

8    in the waiting room.  If not, I can reach out to her and

9    see where she is.  Dr. Eaton is our expert witness and

10   Cali Madia is my partner.

11   THE COURT:  Good morning.  Ms. Hahn, can you

12   hear us?

13   MS. HAHN:  I can hear you, yes.

14   THE COURT:  Okay.  All right, so I'll open the

15   Court.  This is the matter of MH, plaintiff versus ET,

16   defendant, under index 161144 of 2020.  Matter is on

17   today's calendar for an inquest.  Counsel, can I have your

18   appearance for the record, please.

19   MR. SZALKIEWICZ:  Daniel Szalkiewicz, Daniel

20   Szalkiewicz PC, 23 West 73rd Street, New York  10023,

21   for the plaintiff, Marisa Hahn.  As well as my partner,

22   C A L I  M A D I A, appearing virtually.

23   THE COURT:  And there is no appearance on the

24   part of the defense?

25   MR. SZALKIEWICZ:  We have not heard from the

PROCEEDINGS

1    defendant, Your Honor, that's correct.

2              THE COURT:  Of course you put them on notice

3    about today's date, correct?

4              MR. SZALKIEWICZ:  We did, Your Honor.

5              THE COURT:  You can proceed.

6              MR. SZALKIEWICZ:  So, Your Honor, just for

7    technical reasons, I want to ensure that the Court

8    received the exhibits that we e-mailed on Friday.  They

9    should be Exhibits 1 through 13.

10             THE COURT:  Yes, I have reviewed them.

11             MR. SZALKIEWICZ:  So, Your Honor, we call Marisa

12   Hahn to the stand.

13             THE COURT:  Ms. Hahn, raise your right hand.  Do

14   you swear or affirm that the testimony you're about to

15   give is the truth under penalty of perjury, correct?

16             MS. HAHN:  Yes.

17             THE COURT:  Put your hand down.  In a loud clear

18   voice, state your name and current address.

19             MS. HAHN:  Marisa Hahn.  And I'm currently

20   living at 101 Washington Boulevard in Stamford,

21   Connecticut.

22             THE COURT:  Counsel.

23             MR. SZALKIEWICZ:  Your Honor, are the exhibits

24   going to be deemed admitted or do I have to go through the

25   identification process as well?

- J L M -

HAHN – BY PLAINTIFF – DIRECT/MR. SZALKIEWICZ

1      THE COURT:  No, all exhibits previously

2   submitted are deemed admitted into evidence.

3      MR. SZALKIEWICZ:  Thank you, Judge.

4   DIRECT EXAMINATION

5   BY MR. SZALKIEWICZ:

6      Q   Marisa, to make you a little more comfortable today,

7   I would like to start with some simple questions.  How old are

8   you?

9      A   I'm 27.

10     Q   And what do you do for a living?

11     A   I'm in luxury furniture sales, I'm a sales manager.

12     Q   And where do you live?

13     A   I live in Stamford, Connecticut.  I work in

14  Greenwich, Connecticut.

15     Q   Is that where you're from originally?

16     A   No, I'm from a very small town in Connecticut, but I

17  was living in New York, though, the last three years before

18  moving here a year ago.

19     Q   I would like to talk to you a little bit more about

20  your life before the events that precipitated this lawsuit,

21  which would have been 2019.  Where were you living in 2019?

22     A   I had just moved to the Upper West Side in New York.

23  I was excelling at sales in my job, so they transferred me to

24  Upper East Side location.  And, yeah, I was experiencing New

25  York first time.  My brother went to Fordham, so I was excited

1    to live closer to him, be able to spend more time with him.

2    And my cousins were living in the city.  So, yeah, I was just

3    definitely excited to be in the Upper West Side, Upper East

4    Side and continue my career, building my career in the city.

5    Because I know that there is a lot of clients there and I was

6    also taking on the role as an event planner as well.  And

7    shortly after, I was actually contacted by one of my old

8    managers to go work for a company in SoHo as well, to do the

9    same thing with a raise.

10        Q    Can you describe your social life at the time?

11        A    Yeah.  I was a very social person.  That comes along

12   with the role of event planning and coordinating luxury events

13   we would go on.  We would partner with Chrystie's

14   International, Century, and we did a lot of very high, you

15   know, scale events that we had to be professional for.  And it

16   was nice knowing that my brother was already there, meeting

17   with the people, do dinner parties, going out on the town on

18   the weekend, to try and continue to not work.  I was in a

19   relationship at the time.

20        Q    Okay.  And how do you know the defendant in this

21   case?

22        A    I know -- I never met her personally, not once.

23   After Valentine's Day my boyfriend at the time moved in with

24   her and her three other roommates.

25        Q    What was your boyfriend's name?

1    A    Adam Cosmopopos [phonetic].  He went by Cosmo.

2    Q    When you said he moved in with, were they dating or

3    just living together?

4    A    No, they were just living together.  She had a

5    boyfriend at the time named Fran.  He was just, you know, in

6    the process of moving apartments and it was closer to his work

7    to live with them at the time.

8    Q    Did there come to be a time in your relationship that

9    you learned Adam had been unfaithful to you?

10   A    Yes, yep.  Him and Emily had slept together.  And

11   they both admitted it to me and, yeah, we spoke about that.

12   Q    And after they admitted it to you did you take any

13   actions?

14   A    Yes.  I felt betrayed obviously.  And I contacted her

15   boyfriend, Fran, to let him know that this was something that

16   had occurred.  And I know that she submitted to it.  And, yeah,

17   I contacted him to let him know.

18   Q    And do you know whether or not the defendant was

19   aware you contacted Fran?

20   A    At first she was not.  And that's when she proceeded

21   to utilize the fact of having nude images of me to try to

22   blackmail me into not telling him.  And then later she came

23   into realization that I had already spoke with him.

24   Q    And you said that she tried to blackmail you, how did

25   she try to do that?

HAHN - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1     A    She obtained my photos and videos, a handful of them

2  that, you know, are very shameful images of myself that I would

3  never want anyone to see.  And she sent them to me in a very

4  taunting, threatening way on multiple different social media

5  accounts.  And the weekend after she sent them to me on

6  Facebook and Instagram.  She found my father through Facebook

7  and messaged, she sent him a message on Facebook as well.

8     Q    I just want to take a step back.  I e-mailed you the

9  exhibits earlier today, do you have access to them?

10    A    I do.

11    Q    I would like for you to look at what's been marked as

12 Plaintiff's Exhibit 1 into evidence.  Do you recognize this?

13 What is this?

14    A    I'm opening it.  It's a 13 second video of me fully

15 exposed.  Yeah, all parts of my body are exposed.  And it's a

16 picture of me, again, fully exposed.  And the bottom of the

17 camera roll has maybe 15 or more images and videos of me with

18 my ex-boyfriend.  And mainly of me, but in the end you can see

19 videos of me and him.

20    Q    Let's take a step back.  Is this one of the messages

21 you received from the defendant in this case?

22    A    Yes.

23    Q    How did she send this to you?

24    A    On Facebook.

25    Q    And did you give her permission to possess these

HAHN – BY PLAINTIFF – DIRECT/MR. SZALKIEWICZ

1    images?

2         A    No, absolutely not.

3         Q    And did you tell her that she could share these

4    images with anybody?

5         A    No, I told her it's illegal.

6         Q    So, you described the images in the complaint -- I'm

7    sorry, in this message.  I'm just going to ask you quickly to

8    look at Exhibit 2 which is now in evidence.  And is this a true

9    and accurate copy of the a screen shot of the video that was

10   sent to you?

11        A    Yes.

12        Q    And do you know how long the video was?

13        A    Thirteen or so seconds.

14        Q    And is your naked body contained throughout the

15   entirety of the video?

16        A    Yes.

17        Q    I ask you to look at Exhibit 3, please, this is also

18   in evidence.  Is this a larger version of the image that was

19   sent to you in the Facebook message?

20        A    Yes.

21        Q    And you reference at the bottom you could see a sort

22   of half screen roll of a multitude of other images, is that

23   correct?

24        A    Correct.

25        Q    And is that you and each of those images?

– J L M –

1     A    Yes.

2     Q    Do you know who possessed each of those images?

3     A    Emily.

4     Q    Did you ever give her permission to have access to

5 those images?

6     A    No, I never even met her and of course not.

7     Q    And she says, it looks like in a message she also put

8 some words there talking about you harassing her.  Do you know

9 what she was referencing?

10    A    She was referring me telling her boyfriend that she

11 had cheated on her.

12    Q    Besides Facebook, did she contact you in any other

13 means?

14    A    On Instagram.

15    Q    I ask you to look at Exhibit 4, please.  Is this a

16 copy of the Instagram messages sent by Emily to you?

17    A    Yes.

18    Q    Is your naked video or photographs contained in the

19 message?

20    A    Yes, a video.

21    Q    And this is the same 13 second video that was sent to

22 you by the Facebook message?

23    A    Yes, correct.

24    Q    And do you know, did she say anything to you when she

25 sent this Facebook message?

1    A    Yes.  I asked her what she was doing.  What the point

2    of her threatening me with these were and she, you know, she

3    just was in a sarcastic tone and just talking about how I

4    messaged her boyfriend or referred to him as ex-boyfriend.  And

5    that I was over 18 and that she could do what she wants, pretty

6    much, with these videos and pictures, that I was over 18 and

7    that I paid the price.

8    Q    Sorry, do you know the date of these messages?

9    A    February 12, 2020.

10    Q    At that point in time how did you respond to her

11    sending you a copy of the video and your images?

12    A    At that point in time I called a suicide hotline that

13    specialized in this type of, I guess, cause, because they know

14    how to proceed.  I didn't know how to stop something like this.

15    And, quite frankly, I was so depressed and I came out sobbing.

16    My roommate spoke with me and she didn't know how to handle

17    something like this either.  So, it was her idea to call the

18    hotline and ask them for professional advice.

19    Q    So, did you -- I'm sorry, taking a step back there.

20    Did you tell the defendant in this case that sharing your

21    images were illegal?

22    A    Yes, yep.

23    Q    And did you send her a screen shot of the actual New

24    York State law?

25    A    Yes.

HAHN - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1    Q    Just so for the Court's reference, your messages are

2    on the right-hand side, correct?  And the messages received

3    from the defendant are on the left-hand side of this exhibit?

4    A    Yes.

5    Q    And do you know how she responded to you telling her

6    that this was illegal?

7    A    Sorry, she said that I was, she told me to call a

8    lawyer.

9    Q    What does BB stand for?

10   A    It's an abbreviation for baby.  Call a lawyer, baby,

11   throwing it in my face in a very sarcastic tone.

12   Q    And just briefly, Exhibit 5, is that a screen shot of

13   the video that was shared with you by Instagram?

14   A    Yes.

15   Q    And you said that you called a suicide hotline.  Do

16   you know when you did that?

17   A    The same night that she shared the images with me on

18   Instagram and Facebook.

19   Q    Why did you feel the need to call a suicide hotline?

20   A    Because at that point I just didn't know what she was

21   capable of and where -- what she would do with my images and

22   videos.  Like, you know, who she would send them to and post

23   them online.  How it would affect my career.  How it would

24   affect my family.  Just like a lot of, a lot of things were

25   running through my head.  And I didn't know how to stop her.

HAHN - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1   And, you know, I was really ashamed and just scared and

2   depressed at the time.

3        Q   Were you contemplating self-harm that night?

4        A   Yeah, I had very depressing suicidal thoughts.

5        Q   You said she contacted a member of your family, is

6   that correct?

7        A   Yeah, she contacted my father.

8        Q   And how do you know she contacted your father?

9        A   Because that weekend I was so upset I wanted to go

10   home and be around my family. And, you know, receive like some

11   support, without telling them. I had not told them what had

12   happened. And I was sitting there and we were wrapping up

13   dinner and my father said, do you know who Emily is? And my

14   jaw dropped to the ground. And he said she had just sent him a

15   message on Facebook. I lunged across the table and I ripped

16   the phone out of my father's hand because I didn't know what

17   she was going to send him. That caused a huge argument and

18   fight and rift between my father and I.

19        At this point his phone locked so I couldn't see what

20   she had sent him. And he said that it was just a message. And

21   then later on I let my mom know a little bit what was going on,

22   in case she wanted to talk to my father in private. But, yeah.

23        Q   Did this impact, did the defendant's contact impact

24   the relationship between you and your father?

25        A   Yeah. Every day I lived in fear that she would

HAHN - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1    decide to retaliate again and send him those images and videos.

2    She had so many of them.  She was upset.  She had no remorse.

3        Q    Was this the last time that the defendant sent your

4    intimate images to anybody?

5        A    No.

6        Q    When was the next time that she did it?

7        A    A few months later.  In June, I believe.

8        Q    I'm going to refer you to Exhibit 6, which is two

9    page document.  What is this?

10       A    It is a mutual friend of ours that I used to go out

11   with in a social setting, not work.  It was a mutual friend of

12   ours who had 60,000 followers.  She had sent him my nude

13   images.

14       Q    By 60,000 followers, what does that mean?

15       A    On Instagram he has a total of close to 60,000 people

16   following him, like access to those people.

17       Q    And how do you know she sent him your nude images?

18       A    She was with him that day and had posted that she was

19   with him.

20       Q    And did he then send you your nude images or did she

21   send you copies of the nude images from his account?

22       A    She sent the copies from his account.  And she

23   messaged me back and forth on his account.  And then he had

24   taken back his phone and seen that she had been messaging me

25   and had seen the nude images and replied as well.

HAHN - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1    Q    So, I just want to confirm, utilizing his Instagram

2    account she sent you copies of your nude images, again,

3    correct?

4    A    Correct, yes.

5    Q    I'm going to ask you to look at Exhibit 7.  Is this a

6    copy of the nude images that was sent to you on June 23, 2020?

7    A    Yes.

8    Q    And is this the same image that was sent in February

9    or is this a different image?

10    A    A different image.

11    Q    And do you know what she stated to you, if anything,

12    when she sent the images using your friend's account?

13    A    She was just harassing me saying that she liked them

14    a lot and that if I could send her better ones and just

15    laughing at me.

16    Q    And this was the last time that she sent your nude

17    image, correct?

18    A    Correct.  That I know of, yeah.

19              THE COURT:  Let me just interrupt and make sure

20         I understand something.  Is your understanding, Ms. Hahn,

21         that as a result of this transmittal to this friend of

22         yourself, who has 60,000 followers, that these photos were

23         all accessible to those 60,000 people?

24              THE WITNESS:  I was in fear that at any given

25         time, you know, sometimes men ask if you know so and so.

- J L M -

1    So, yes, I was in constant fear that he could send them to

2    any of his followers, or if she had access to his phone,

3    that she would post them for 60,000 people to see.

4              MR. SZALKIEWICZ:  Your Honor, maybe I can

5    clarify.  This was sent in a private message, but it was

6    sent to an individual who had 60,000 followers.  So it was

7    never actually disseminated to all 60,000.  But he does

8    possess the image and has the potential, and so does the

9    defendant have the 60,000.

10             THE COURT:  Thank you for the clarification.

11   Q    I want to talk about your damages.  How did the

12   defendant's conduct affect you?

13   A    I had depression, anxiety, I had constant trouble

14   sleeping at night.  My thoughts were constantly circulating.

15   And I lost focus at work because I felt the need to check all

16   the social media platforms constantly to make sure that she

17   wasn't further attacking me or blackmailing me or posting my

18   images.  I grew -- I felt isolated.  I grew away from my family

19   just in fear, again, that something like this would happen.

20   Q    Did this impact you professionally at all?

21   A    Yes.  When I was applying for new jobs, the job that

22   I wanted to take was located very close to where I knew that

23   she was living.  So I almost didn't take the job just because I

24   knew that there would be a larger chance of me running into

25   her.  And I didn't know if seeing her in public, I thought in

1    my mind that might trigger her to do something again.

2        Q    Did this impact your relationship with technology and

3    social media at all?

4        A    Yes, I was constantly living in fear, and still am,

5    that these images will recirculate.  The iPhone and iCloud, the

6    technology that we have today, you know, someone says that they

7    Tweet something and it's saved and still a million other places

8    and other people have it.  And I just don't feel safe.

9        Q    What about relationships with friends?

10       A    Yeah, it's mortifying to go out.  And she was living

11   with four girls at the time.  And to know that they saw the

12   images and that people that I used to go out with to dinner,

13   out for drinks maybe seen images, it's humiliating.

14       Q    Besides the relationship with your father, did this

15   impact any relationship with any of your other family members?

16       A    My brother.  I lived -- I felt ashamed.  So my

17   brother, someone who was a mentor to me and he's never had

18   anything like this happen to him.  And I just felt truly

19   ashamed that I had to live with this.  And that, you know, New

20   York is a big city, but it's actually very small.  So, I just

21   was afraid that he might some day see them as well.

22       Q    And did the defendant's conduct impact you physically

23   at all?

24       A    Yes.  I was about 20 pounds skinnier at the time.  I

25   walked to work every day and I would change my route to not

1    walk past her apartment, when I did finally get the courage to

2    take the job that I took near her apartment.

3           So, yeah, I had lost a lot of weight.  And just

4    sleepless nights and not eating and walking to work will make

5    you lose weight.

6    Q    Did you remain living in the same apartment at the

7    time -- I'm sorry, I already asked that question.

8           Did you continue to live in the apartment that you

9    were living at at the time that the defendant shared your

10   images?

11   A    I did until the lease was up and then I moved.  And

12   then I moved again, I left the city.

13   Q    Why did you ultimately leave the city?

14   A    I just felt like my experience there, because of the

15   situation, wasn't positive and I wanted a fresh start.

16   Q    What made you decide to initiate a lawsuit?

17   A    Because I thought that was the only thing that I

18   could do to stop her.  Just a person that showed no remorse.

19   And everyone said that she was sorry.  I never once came, met

20   her, so how could she judge the type of people that I was, and

21   do something negligent and horrible to me without having met

22   someone.  So, I thought that the only safe way to stop her was

23   to contact a lawyer.

24   Q    Because of the defendant's conduct did you seek

25   mental health treatment?

1  A    I did.  I saw a psychiatrist back then and then I

2  began seeing one most recently prior to having to do this.

3  Q    So, let's start with 2020.  What symptoms were you

4  experiencing in 2020 that led you to treat with a psychiatrist?

5  A    I was in depression.  Anxiety, like I said.  Not

6  being able to focus.  Constantly checking my social media.  I

7  had trouble sleeping.  I had paranoia.

8  Q    What was the name of the doctor you treated with?

9  A    Dr. Sally Romano.

10  Q    Did she prescribe you with any medication?

11  A    She did, yep.

12  Q    Which medications did she prescribe you with?

13  A    Sertraline.

14  Q    I didn't mean to cut you off, I'm sorry.  What is

15  Sertraline?

16  A    It's an anti-depressant medication.

17  Q    Did the medication have any side effects on you?

18  A    It gave me migraines.

19  Q    Do you know whether or not Dr. Romano diagnosed you

20  with anything?

21  A    She diagnosed me with depression, anxiety and ADD.

22  Q    Do you know for approximately how long you had

23  treated with Dr. Romano?

24  A    Six months.

25  Q    And why did you stop treating with her?

1    A    I felt like I had, with seeing her frequently and

2  being on the anti-depressants for that amount of time, I felt

3  like I had become a little bit more at a stable place in my

4  life.  And I was moving, so I needed to find a doctor somewhere

5  else.

6    Q    And after did you actually find another doctor?

7    A    I sought a regular physician.  I tried contacting

8  maybe ten or so different therapists, but I had trouble making

9  an appointment there, because in New York they weren't taking

10  on new patients because of the rise in people needing

11  therapists during the pandemic.

12    Q    Are you currently treating with a therapist?

13    A    I am working with my psychiatrist now, living in

14  Connecticut to find one.

15    Q    Who is Dr. Lynne Lazarus?

16    A    That is my current psychiatrist.

17    Q    So, have you been seeing Dr. Lazarus?

18    A    Yes.

19    Q    And do you know if Dr. Lazarus diagnosed you with

20  anything?

21    A    She diagnosed me with PTSD symptoms.

22    Q    Anything else?

23    A    Anxiety and ADD.

24    Q    Are you currently taking any medications?

25    A    I am.

1    Q    And what medications are you taking?

2    A    Wellbutrin, Propranolol and Adderall.

3    Q    Why are you no longer taking the Sertraline?

4    A    Because like I had come to a better place and she

5    wanted to try something else, a different anti-depressant for

6    the time being.

7    Q    You said that she diagnosed you with PTSD symptoms,

8    is that correct?

9    A    Yes.

10   Q    Do you know what the underlying trauma was that led

11   you to having the PTSD symptoms?

12   A    It was the events that occurred in 2020.

13   Q    By the defendant that we're discussing today?

14   A    Yes.

15   Q    And is Dr. Lazarus covered under your insurance?

16   A    She is not.  I have to pay out-of-pocket for her.

17   Q    And do you know how much a session is with her?

18   A    Around 170.

19   Q    And Exhibit 8 are true and accurate copies of your

20   medical bills to today with Dr. Lazarus?

21   A    Yes.

22   Q    And just a few more questions.  You signed an

23   Affidavit of Merit in this case when we filed the motion for

24   default judgment, is that correct?

25   A    Yes.

1    Q    And do you reaffirm all the statements that were in

2    in affidavit?

3    A    Yes.

4    Q    And that's Exhibit 9, correct?

5    A    Yes.

6    Q    So, besides the anxiety, stress and other symptoms,

7    did the sharing of the images affect your life in any other

8    way?

9    A    Yeah, I guess at the time like I had ambitions to

10   like be an event planner for my company and further, I didn't

11   plan to leave New York.  So, yeah, it affected a lot of aspects

12   of my life.  And with my family as well, yeah.

13   Q    So, we're here today on an inquest because Emily did

14   not appear in this action.  Do you know whether Emily ever

15   received copies of the papers that were served on her?

16   A    Yes, because in having mutual friends in the same

17   circles of friend groups, I was told that she received the

18   documents and she pinned them to her ceiling so all of her

19   friends could look at it and laugh.

20   Q    And how did that make you feel?

21   A    Like this is all a joke to her and she didn't take

22   any of it seriously.  And, honestly, like the way I grew up

23   and, you know, like I'm a forgiving person.  Had she just said

24   sorry and taken account that this is the New York law and it's

25   illegal for her to do it, I wouldn't be here today.

HAHN - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1    Q    Do you still have a fear that Emily will share your

2    images again?

3    A    Of course, yeah.  Like I said before, those images

4    don't just go away.  And with someone like that who doesn't

5    have remorse and is the type of person that she seems to be,

6    yeah, I never know, someone could say the wrong thing or she

7    could see me out, and this could all happen all over again.

8         MR. SZALKIEWICZ:  Your Honor, I have no further

9         questions for the witness.  If you do, obviously she's

10        available.

11        THE COURT:  The Court has no questions.

12        MR. SZALKIEWICZ:  Thank you, Marisa.  You're

13        excused.

14        (Witness excused)

15        MR. SZALKIEWICZ:  Your Honor the next witness we

16        have is Dr. Asia Eaton.  I would call her to the stand.

17        Do you want us to go through her certifications and

18        qualifications that certified her as an expert or do

19        you --

20        THE COURT:  Just briefly.

21        MR. SZALKIEWICZ:  Very good.

22        THE COURT:  Raise your right hand.  You solemnly

23        swear or affirm that the testimony you are about to give

24        is the truth under the penalties of perjury, correct?

25        THE WITNESS:  Yes.

- J L M -

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1          THE COURT:  Put your hand down.

2          THE WITNESS:  Yes, I'm sorry, I was on mute.

3          THE COURT:  For the record, state your full name

4     and current business address.

5          THE WITNESS:  Dr. Asia Eaton.  And I guess the

6     university address is as my business address, 11200

7     Southwest Eighth Street.  The room is DM 208 in Miami,

8     Florida  33199.

9          THE COURT:  Spell your last name for us.

10          THE WITNESS:  E A T O N.

11          THE COURT:  Counsel.

12   DIRECT EXAMINATION

13   BY MR. SZALKIEWICZ:

14     Q    Good afternoon, Dr. Eaton.

15     A    Hi.

16     Q    We're going to go through some basic background

17   questions as to your training and expertise, okay?

18     A    Sure.

19     Q    Do you have any specialized degrees or training?

20     A    Yes, I have two master's degrees.  One is psychology

21   and one is counselor education, with a specialty in clinical

22   mental health counseling.  And I have a PhD in psychology from

23   the University of Chicago.

24     Q    When did you receive those degrees?

25     A    My first master's in 2006.  My PhD in 2009.  And my

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1  second master's in counselors and education in 2019.

2     Q    Where are you currently employed?

3     A    At Florida International University in Miami,

4  Florida.

5     Q    And for how long have you been employed by FIU?

6     A    I started in my post-doc position in 2009.  Then I

7  started on the tenure track on 2012.

8     Q    What is your present title?

9     A    I'm an Associate Professor of Psychology and Director

10 of the Applied Social and Cultural Psychology program.

11    Q    Can you tell me a little bit more about the Applied

12 Social and Cultural Psychology program?

13    A    Just like it sounds.  How social and cultural

14 theories and methods affect people's day-to-day functioning.

15 It looks at the psychology, social settings, systems and

16 policies.

17    Q    Is there a particular area of research related to

18 this area that you focus on?

19    A    Yes.  I do research on gender based violence,

20 reproductive justice, minority stress of discrimination and

21 prejudice.

22    Q    And can you tell me briefly what gender based

23 violence is?

24    A    Sure.  It's violence that is disproportionately

25 perpetuated by one gender against another, or violence that

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1  leverages gender, and also to enact harm.

2      Q    Is nonconsensual pornography included in gender based

3  violence?

4      A    Yes, it is.  It is disproportionally committed

5  against women by men.  And the effects that this violence has

6  are different for women and men.

7      Q    Have you published any peer reviewed journal

8  articles?

9      A    Of any kind?

10     Q    Related to gender based violence?

11     A    Yes, probably 20 related to gender based violence,

12  and over 50 publications in total.

13     Q    What about specifically relating to nonconsensual

14  pornography?

15     A    Probably five, if you include the work I've done on

16  sextortion, which is threatening to release intimate images

17  unless the victim complies with demands.

18     Q    Have you been asked to speak to the topic or present

19  participation in any presentations on nonconsensual

20  pornography?

21     A    All the time.  I couldn't even tell you how many

22  presentations I've done on that topic.

23     Q    And your work on nonconsensual pornography, you've

24  conducted interviews on?

25     A    Yes, I have.

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1    Q    Do you know approximately how many victims over the

2    years you've spoken to?

3    A    Probably around 50.

4    Q    And what about overseeing studies where some of your

5    students or other individuals would have spoken to victims of

6    NCP?

7    A    Yes.  I have also conducted survivor based research,

8    one study on over 3000 individuals.  Another study on 2800

9    individuals.  So, I've done survey based researches and my

10   students have conduct their own interviews probably on the

11   order of a hundred.

12   Q    And you've overseen your students' work?

13   A    And I've overseen their work, yes.

14   Q    We attached as Exhibit 10 a copy of your resume.  Is

15   that a true and accurate copy of your resume as of

16   September 2022?

17   A    Yes, I looked at it in an e-mail earlier.  Yes, it's

18   correct.

19   Q    And beside today, and I know that you've worked on

20   some other cases for us, have you served as an expert witness

21   in the past?

22   A    I have written expert witness reports.  I have never

23   actually been called to give expert witness testimony.

24            MR. SZALKIEWICZ:  Your Honor, we move to have

25       Dr. Eaton qualified as an expert in the field of forensic

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1    psychology and particularly issues related to image based

2    sexual abuse.

3              THE COURT:  The application is granted.  The

4    doctor is so qualified.

5              MR. SZALKIEWICZ:  Thank you.

6    Q    Dr. Eaton, what inquiries were you asked to do

7    relating to Marisa's case?

8    A    Well, I was asked to determine whether Marisa was a

9    victim of nonconsensual pornography.  I was asked to assess the

10   extent to which her experience with victimization matches the

11   empirical evidence on the harms of nonconsensual pornography.

12   Q    And in order to do this did you meet with Marisa?

13   A    Yes, I did.  And we had an hour long Zoom interview.

14   And I also reviewed the documents related to this case.

15   Q    And on what basis did you reach your conclusions in

16   this matter?

17   A    Well, that's kind of a complex question.  I drew from

18   the literature on image based sexual abuse.  From my own

19   training and expertise with victims of gender based violence.

20   From a number of documents that you provided from the interview

21   with Marisa.  From published papers.

22   Q    So, we've used a lot of different terms today.  Just

23   briefly, what is nonconsensual pornography?

24   A    Nonconsensual pornography, is the act of

25   disseminating or threatening to disseminate intimate images of

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1    someone without their consent.  So, it's an umbrella term that

2    actually covers both the dissemination and the threat of the

3    dissemination.  The threats of the dissemination are typically

4    referred to as sextortion.

5         Q    And it's sometimes also referred to as NCP?

6         A    Yes, that's the shorthand for nonconsensual

7    pornography that I use frequently.

8         Q    And what about revenge pornography, is that the same

9    as NCP?

10        A    No, that's a media generated term that really doesn't

11   have scientific support.  Sometimes researchers and

12   practitioners use the term because other folks are familiar

13   with it.  Revenge pornography refers to nonconsensual

14   dissemination of intimate images to seek revenge against the

15   victim.  But that doesn't cover many different types of

16   nonconsensual pornography.  And it's a misnomer, because the

17   motive is not necessarily revenge, which the people do

18   themselves.  And the victim didn't necessarily do anything

19   wrong for which revenge is required, so.

20        Q    And sort of the last term we discussed is image based

21   sexual abuse.  Is this the same as NCP?

22        A    That's an even broader umbrella term.  And

23   nonconsensual pornography is a form of image based deepfakes,

24   which are when a victim's image is superimposed on someone

25   else's body, or victim is made to look like they are in an

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1  intimate position when they are not actually.  Upskirting is

2  another form of image sex abuse, which is down blousing or

3  taking pictures down someone's blouse, or up their skirt

4  without their consent.  All of them have to do with lack of

5  consent for taking or distribution of images that may be real

6  or false.  But in nonconsensual pornography it's real authentic

7  images.

8      Q    And just to narrow it down.  This would be classified

9  as NCP?

10     A    That's correct.

11     Q    You said revenge isn't the only motive, which why

12 research porn is not a great term.  What are other common

13 motives in cases you experienced?

14     A    Sexual gratification, moving oneself to a deviant

15 peer network just for the likes or up votes.  Sometimes sharing

16 with friends because of pride or boredom or curiosity.

17     Q    So, with NCP, based on your experience and research

18 and expert opinion, are there common effects that victims

19 experience?

20     A    Yes.  There are common effects that we have

21 medicalized language to use.  And then there are common effects

22 that go beyond medicalized language and understandings.  PTSD

23 is extremely common, as are depression and anxiety.  So those

24 are your sort of common diagnoses that you would receive from a

25 medical professional.

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1       There is also themes that have been identified in

2  long-term qualitative research with victims that go beyond

3  medicalized understandings, apathies, include social rupture,

4  constancy, existential threat, isolation and constrained

5  liberty.

6       Q    I want to discuss those five themes.  In your

7  interview with Marisa did you identify whether she experienced

8  any of these five themes?

9       A    I did.  I did.  I asked her very open-ended,

10 non-leading questions based on best practices and trauma

11 informed interviews, and based on a three year study done by

12 Clare McGlynn that elucidated these themes.  And I reviewed the

13 transcript for the emergence of these themes.

14      Q    You also heard Marisa's testimony today?

15      A    I did, yes.

16      Q    The first theme is social rupture, is that correct?

17      A    That's correct.

18      Q    What is social rupture?

19      A    It's a breach that radically disrupts the life and

20 sense of self of the individual, as well as all their

21 interactions with others.

22      Q    And can you give me some examples of social rupture?

23      A    Sure.  Feeling contamination and disgust.

24 Fundamental change to oneself image and self-esteem.

25      Q    Do you believe that Marisa experienced symptoms of

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1   social rupture?

2        A    Yes, this wasn't the strongest theme among the five

3   in her case.  But she mentioned in the interview with me that

4   she had lost a piece of herself.  That she lives fundamentally

5   changed.  Not just materially but her inner life.  Her feeling

6   of safety in the world and ability to trust in people.  She

7   felt a constant sense of shame.  And I think that this is

8   related, among other things, to the repeated nature of the

9   harms that were done to her, the repeated harassment.

10       Q    What was the strongest theme that you determined?

11       A    The constancy.

12       Q    What is constancy?

13       A    The constancy is the feeling that victims have that

14   they cannot escape the abuse.  It's present all the time in the

15   physical world and the digital world.  The constant threat of

16   victim's photos being rediscovered, redistributed.  It creates

17   a constant fear, anxiety rather than distress, that require

18   life-long treatment.

19       Q    And based on your research and experience, is this a

20   theme that goes away from victims of NCP like Marisa?

21       A    You know, it rarely resolves completely, in my

22   experience.  Women tend to have even less resolution than men

23   when they are victims of image based sexual abuse.  And Marisa

24   demonstrated this in quite a number of ways.

25       Q    The next theme you mentioned was existential threat,

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1  correct?

2      A    That's correct.

3      Q    What is existential threat?

4      A    Existential threat -- do you mind if I look at my

5  notes briefly?

6      Q    It's up to the Court.

7          MR. SZALKIEWICZ:  Do you mind if she pulls the

8      definition for existential threat?

9          THE COURT:  That's fine.

10     A    Existential threat, sorry, I have my notes all turned

11  around, has overlaps with constancies.  The threats of

12  reemergence are constant and it manifests in visual and

13  hyper-checking of social media and in-person interactions also.

14     Q    And in this case did Marisa exhibit signs of

15  existential threat?

16     A    Oh, yes.  She said that she spent time at work

17  Googling her name.  She would search Emily's social media

18  profile.  And she would wake up and check social media

19  immediately.  She was constantly distracted at work with the

20  thought of checking for the reemergence of the images.

21     Q    Another theme of the four out of five is isolation.

22  What is this theme?

23     A    Isolation is when individuals are internally and

24  physically socially distanced from others as a result of the

25  distribution of images.  Conflicts that may have occurred due

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1  to the distribution of images.  The threat of distribution of

2  the images.  Often there is a profound breach of trust between

3  the victim and other people in their lives.

4      Q    And did Marisa exhibit any of these signs?

5      A    Yes, she became withdrawn from her friends, distanced

6  from her family.  She reported to me in her interview that she

7  didn't go on her annual family, I believe that it was a ski

8  trip, because she didn't feel that she could be present with

9  others, and didn't want to have negative reactions from others.

10     Q    And the final theme was constrained liberty.  What is

11 that?

12     A    Constrained liberty is the victim's inability to

13 navigate the world.  And Marisa demonstrated this in a number

14 of ways.  She was scared to run into those who might have seen

15 the images.  Scared to run into Emily.  Changed the way that

16 she walked to work.  Moved to being closer to work.  At a

17 certain point she felt that the threat was so inescapable, that

18 suicide was the only way out.

19     Q    So, I know that we talked briefly about constancy,

20 but does the passage of time lessen the effects of these five

21 themes that Marisa was suffering from?

22     A    Sometimes and sometimes not.  And as I said, in my

23 own research I found that women, perhaps of gender sexual

24 double standards, tend to have these effects linger for longer

25 than men.

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1    Q    Just to sort of summarize, I guess an important

2    question is, these images weren't shared on the Internet, they

3    were sent, that we know of, they were sent directly to Marisa.

4    Is that threat enough for someone to experience these symptoms?

5    A    Yes, it is.

6    Q    And in 2020 did you conduct a survey where you did

7    the research of nonconsensual pornography amongst adults?

8    A    Yes.

9    Q    Do you know how many, approximately, how many

10   individuals you surveyed for that?

11   A    I think 2800 or 3000.

12   Q    And were all these people victims of NCP?

13   A    No.

14          MR. SZALKIEWICZ:  At this time we don't have any

15       further questions.

16          Thank you very much, doctor.

17          THE COURT:  I want to ask the doctor a question.

18       You have a prognosis for this patient, doctor?

19          THE WITNESS:  So, while I have a degree in

20       clinical mental health counseling, I'm not a licensed

21       clinical psychologist or social worker or mental health

22       counselor, so I don't provide diagnoses.  But what I can

23       do as a research scientist, is examine the similarity

24       between Marisa's experience and the bulk of the evidence

25       on victim's well-being following victimization over time.

PROCEEDINGS

1    And her case is very textbook, it's very consistent with

2    the five themes that I've described, as well as with

3    additional research demonstrating that victims frequently

4    are diagnosed with PTSD, depression and anxiety.

5            THE COURT:  Based on your experience, I'll ask

6    you, based on your experience, you heard Marisa's

7    testimony today and particularly that in which she

8    indicates that she anticipates continuing to see mental

9    health professionals and psychiatrists in the future, is

10   that a reasonable approach for Marisa to take under the

11   circumstances?

12           THE WITNESS:  Very.  In fact, a necessary

13   approach.

14           THE COURT:  You testified earlier that sometimes

15   these, or frequently these issues remain with a person for

16   the entirety of their lives, correct?

17           THE WITNESS:  That's correct.

18           THE COURT:  Is that a possibility in Marisa's

19   case as well?

20           THE WITNESS:  It's a possibility.  I mean,

21   individuals do find ways of coping and distracting

22   themselves.  The level of heightened paranoia and fear

23   that they experience in the weeks following the

24   victimization, if they are no longer victimized, does tend

25   to dissipate somewhat.  But there is an ongoing sense of

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1    fear and lack of safety that follows many victims through

2    the rest of their lives.  Because truly, the images could

3    reappear at any time.

4            THE COURT:  Thank you.

5            Anything else?

6   DIRECT EXAMINATION

7   BY MR. SZALKIEWICZ:  (Continued)

8       Q    And the fact that Marisa's understanding that the

9   defendant still possesses these images, does that add to her

10  potential future of fear and permanency of her symptoms?

11      A    Oh, absolutely.  And the fact that she has multiple

12  images and she has demonstrated that she has the power and

13  willingness to contact individuals in Marisa's network, all of

14  those things contribute.

15      Q    And are there common themes for people who have

16  expressed the effects of NCP, is there a common way that they

17  were victimized or a common approach that you found in your

18  research?

19      A    Victimization is the experience of, victimization is

20  the way the -- who the perpetrator is, the means by which the

21  person is victimized, what they are extorted for.  If there is

22  an extortion, this varies a lot.  Sometimes it's an intimate

23  perpetrator who is the perpetrator.  That is pretty common,

24  especially for women.  For men it's also a stranger who is

25  extorting them for money or other things.  I hope that answered

DR. EATON - BY PLAINTIFF - DIRECT/MR. SZALKIEWICZ

1   your question, which was sort of --

2       Q    That's fine.  Obviously, if you don't understand,

3   you're more than welcome to ask me.

4           You said there are some situations where victims are

5   able to overcome some of the factors that Marisa is exhibiting,

6   is that correct?

7       A    Yes.

8       Q    And is there a common theme between these victims

9   that are able to overcome it quicker than some, possibly in

10  Marisa's case?

11      A    Often these individuals become activists in the field

12  and that is their strategy for coping.  They speak outwardly in

13  public and sort of turn the tables on the -- their victim

14  becomes survivors who work to create laws and practices that

15  will protect future victims.  So, often the only choice, and it

16  ultimately can be a very healthy choice, is to embrace the

17  reality of the constancy of the images and turn it on its head

18  by becoming an activist.

19              MR. SZALKIEWICZ:  All right.  Thank you, doctor,

20      I appreciate it.  I have no further questions, Your Honor.

21              THE COURT:  Nor does the Court.

22              MR. SZALKIEWICZ:  Thank you.  You're excused,

23      doctor.

24              (Witness excused)

25              THE COURT:  Thank you.

                        - J L M -

PROCEEDINGS

1    MR. SZALKIEWICZ: So, Your Honor, as part of the

2    exhibits, and obviously under the law, there is a

3    potential entitlement to the attorney's fees. Exhibit 12,

4    that was submitted, is an attorney fee application done by

5    our firm. We had the total hours worked we anticipated,

6    under anticipated, but still some of the hours worked.

7    We've also attached our resume invoices that were done

8    contemporaneous, and a copy of the retainer. And we're

9    asking $25,000 in attorney's fees. Exhibit 13 is a

10   summary of our request for damages.

11   THE COURT: I notice in your request for damages

12   you're not asking for -- you're asking for only $646 in

13   past medical expenses, is that correct?

14   MR. SZALKIEWICZ: That's correct, Your Honor.

15   Our client, while we didn't go into this testimony, that's

16   based on out-of-pocket now for the current medication

17   she's on, which is approximately $180. She was covered by

18   her mother's health insurance for the treatments with Dr.

19   Romano. So that's based on bills that we have provided

20   the Court, which were Exhibit 8.

21   THE COURT: Very good.

22   MR. SZALKIEWICZ: The other thing is, we

23   obviously don't have a financial expert to come in and

24   talking about life expectancy. We request that the Court

25   take judicial notice of the life expectancy table. I did

PROCEEDINGS

1    not include the one from the PJI, I believe that it was

2    2019.  This came directly from the New York State

3    Department of Health.  So, we request that the Court take

4    judicial notice of Exhibit 11.

5         THE COURT:  Very good.  Any further evidence to

6    be presented?

7         MR. SZALKIEWICZ:  No, Your Honor, just Exhibits

8    1 through 13.

9         THE COURT:  All right.  The Court will of

10   course, having reviewed the documents, grant counsel

11   attorney's fees as requested.  The Court will take

12   judicial notice of the life expectancy data which has been

13   provided.  As I mentioned earlier, all the exhibits

14   previously submitted have been deemed and received and

15   marked in evidence.

16        The Court finds as follows after inquest:  With

17   respect to the plaintiff's request for damages, for

18   compensatory damages for emotional distress, the Court

19   awards the sum of $350,000.  With respect to past medical

20   expenses the amount requested is granted, $646.05.  With

21   respect to the future medical expenses the Court awards

22   $110,000.  With respect to punitive damages the Court

23   awards the amount requested of $750,000.  Regarding

24   attorney's fees the Court awards the amount of $25,000 as

25   requested.  The Court also awards expert fees in the

PROCEEDINGS

1    amount of $1500 as requested.

2          MR. SZALKIEWICZ:  Okay.  Your Honor, we should

3    submit a proposed judgment to the Court or --

4          THE COURT:  Hold on one second, that's an

5    administrative question I have to explore.

6          (Pause)

7          THE COURT:  Back on the record.  In addition to

8    the foregoing, the Court also will award plaintiff with

9    costs and disbursements as assessed by the clerk.

10          MR. SZALKIEWICZ:  And interest from today?

11          THE COURT:  And interest from -- you're given

12    interest from the date the matter was determined in your

13    client's favor.  You want from day?  Fine.  Interest from

14    today's date, September 13, 2022.

15          MR. SZALKIEWICZ:  Thank you very much.

16          THE COURT:  Thank you very much.  Good luck

17    everybody.

18          MR. SZALKIEWICZ:  Thank you.  I appreciate it.

19          (Proceedings concluded)

20    CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT.

21

22              _____

23              JACK L. MORELLI, CM, CSR

24

25

- J L M -